## Tiernan et al. *versus* Roland and Blackstone.

1. A purchaser of *an estate in fee* will not be compelled to take a life estate only, nor an estate in which the vendor had *no* interest as owner at the time of the pretended sale. But where the seller, though not the owner of the fee, has an equitable estate in the premises under articles of agreement for its purchase, and the right to acquire the legal title, and actually acquired it, after the contract of sale, but before any laches could properly be imputed to him, he may compel a specific performance.

2. A party claiming real estate under articles of agreement, after a written contract of sale by him of the premises in fee, conveyed one moiety of his interest in certain larger premises, including the ground previously sold, to a third person, with a knowledge by such third person of the previous contract of sale, and with an understanding that it was to be carried out: *Held*, that such conveyance did not amount to an abandonment of the contract on the part of the seller, and furnished no valid ground to the purchaser to refuse to consummate the contract.

3. Vendors, and one claiming under one of them, in proper time executed a deed conveying the premises to the vendee and her heirs, and endeavored to have it tendered to the vendee, but the tender was prevented by her sickness and death; but it was afterwards offered to her executors, the deed, however, being accompanied with a mortgage and bonds for execution: *Held*, that though the deed was insufficiently acknowledged by the wives of the grantors, and the bonds were not such as were provided for in the contract, as respected the time of payment, but the executors or devisees of the purchaser did not object to receiving the deed on the ground that the deed and the bonds and mortgage did not conform to the covenants between the parties, but refused generally to perform the contract; and there was no evidence of a refusal on the part of the vendors to amend the acknowledgment or to accept of other securities, in accordance with the contract; such tender is evidence of the willingness and desire of the vendors to comply with their agreement.

4. Time may be of the essence of a contract, either by the express stipulation of the parties, or by implication, from the nature of the property, or the avowed objects of the purchaser or seller; but where it is not so, either expressly or impliedly, if a party seeking specific execution has been guilty of gross laches, or inexcusably negligent in performing the contract on his part; or if there has been a material change of circumstances, affecting the rights, interests, and obligations of the parties, rendering it unjust to decree specific performance, equity will refuse to direct it: but, except under these or analogous circumstances, time is not treated as of the essence of the contract, and relief will be decreed to the party seeking it, if he has not been grossly negligent, and comes within reasonable time, although he has not complied with the strict terms of the contract.

5. More than *simple notice* is necessary, on the part of a purchaser, of his design to rescind a written agreement for the purchase of real estate: he must, to that end, on the day fixed for the completion of the contract, or, where no day is fixed, within a reasonable time, demand a conveyance, with notice that if the contract be not completed, he will not be bound by it; and by the custom of the State, the vendee should tender for execution the necessary papers, especially where the time of payment of the purchase-money is optional with the vendee.

6. It is no valid objection to the execution of a contract for the purchase of real estate that the vendee has died, and that, therefore, the execution by the vendee of the bonds and mortgage, required by the contract, is impossible. The heirs at law or the residuary devisees of the vendee's estate may carry out the contract. But, where such a difficulty arises from the death or bankruptcy of the purchaser, it perhaps may be in the option of the seller to rescind the

[Tiernan et al. *v.* Roland and Blackstone.]

contract or to demand specific performance; and if defendants are unable or unwilling to perform the contract, perhaps the estate may be sold, and defendants ordered to pay any difference in the amount of the purchase-money. Per BELL, J., and see cases cited.

7. The execution by the vendors of a mortgage on the premises sold, after the making of the agreement to sell, is not a ground to avoid the contract on the part of the purchaser, provided the encumbrance be removed before the vendor is called on to make title to the premises, or, at least before his bill, praying for specific execution, was filed.

8. Whether estates-tail are partible in Pennsylvania, by deed of partition between the parties interested, so as to bar the entail, argued in the case, but not decided.

9. A *feme covert*, being tenant in remainder dependent upon an estate-tail, having accepted a legacy under the will of her father, (who, acting on the validity of a deed of partition of the estate-tail, and asserting a several estate in himself by virtue of the deed of partition, devised the same in fee to his sons,) is barred by her election; and inasmuch as the will stipulated for a general release by her, the presumption, at this distance of time, above one hundred years, is that the legacy was paid to her, and that she executed the release. The doctrine of election applies to persons under disabilities, and to interests immediate or remote, contingent, of value or not of value.

APPEAL to the Supreme Court in Equity, from the *Nisi Prius.*

A bill of Francis Tiernan and Peter Shoenberger, of the city of Pittsburgh, dated 22d September, 1845, was filed against Henry Roland, of the county of Lancaster, and Thomas Blackstone, of the city of Philadelphia, executors and devisees in trust under the will of Catharine Yohe, formerly of Philadelphia, deceased, and Henry M. Watts, of the city of Philadelphia. The bill prayed for specific performance, on the part of Roland and Blackstone, of an article of agreement, *dated 9th December*, 1839, between Peter Shoenberger and Francis Tiernan of the first part, and Catharine Yohe, of the second part, by which Shoenberger and Tiernan agreed to sell to Catharine Yohe, in fee simple, a certain lot or piece of ground on the north-west corner of Broad and Federal streets, in the township of Moyamensing and county of Philadelphia. In consideration of which, Mrs. Yohe was to pay $7200, viz. $500 in hand on the execution and delivery of the agreement, and the balance of $6700, with interest from the date of the agreement, payable semiannually, to be secured by bond and mortgage, and payable on the 9th day of December, A. D. 1846, or before, if the party of the second part prefers. The deed for the property aforesaid, and the bonds and mortgage, are to be executed and delivered on the —— day of —— A. D. ——. The agreement under seal was signed by F. Tiernan, for himself and P. Shoenberger, and by Catharine Yohe.

It was stated in the bill that Catharine Yohe, in lieu of the payment of the $500, gave her promissory note at sixty days, for that amount, payable to the order of F. Tiernan, as a fulfilment in part of the consideration of the agreement.

It was also averred that Mrs. Yohe died on the 16th February,

[Tiernan et al. *v.* Roland and Blackstone.]

1840, having made her will, bearing date the 22d *March*, 1839, with a codicil, bearing date 2d April, 1839, by which she nominated Henry Roland and Thomas Blackstone her executors, and whereby, after directing that all her just debts and funeral expenses shall be paid, she made certain devises to Roland and Blackstone, and the survivor of them, in trust for the sole and separate use of her three daughters; and, for the purpose of paying her debts and of making a division of her residuary estate, she authorized her executors and devisees in trust to sell all the rest of her real estate and the fixtures and other personal property in the North American Hotel, and out of the proceeds of sale, after payment of the debts, she devised as set forth in the will.   The will was proved on 26th February, 1840, and letters testamentary issued to Roland and Blackstone.

It was further stated, that a suit at law was instituted in the District Court, Philadelphia, of March term 1841, by Tiernan against Roland and Blackstone, executors and trustees, &c., to recover the amount of the note, and judgment was obtained on or about 29th November, 1843, for $521.25.

It was also averred that, by the terms of the agreement, Catharine Yohe reserved to herself the option of paying the $6700, with interest, at any time previous to the 9th December, 1839, (it should have been 9th December, 1846;) and that as the deed and bond and mortgage were to be executed and delivered on the —— day of —— A. D. ——, it was not incumbent on the first party to make any tender of a deed before the party of the second part signified her election as to the period when the payment of the $6700 should be made, which election the party of the second part never signified to the party of the first part.

It was averred that the complainants have been always ready and willing to perform their part of the agreement, and, on payment of the $500 and the execution of the bond and mortgage for securing the payment of the sum of $6700, with interest, to convey in fee simple to Catharine Yohe, her heirs and assigns.

It was further alleged that Shoenberger and wife, on the 5th February, 1840, by deed, conveyed to the said Henry M. Watts, his heirs and assigns, one undivided half-part of the interest and estate which the said Shoenberger held as a tenant in common, in fee simple, with Tiernan, in about fifteen acres, which included the lot purchased by Mrs. Yohe; and that before such conveyance, Henry M. Watts had full notice of the agreement of sale with Mrs. Yohe; and that he received the deed subject to that agreement, and with an understanding, that so far as it depended on him, he would be ready to comply with it.

Further, that Tiernan and wife, Shoenberger and wife, and Watts and wife, on the 6th February, 1840, did seal and acknowledge a deed in fee simple to Catharine Yohe for the lot of ground

agreed to be sold to her, and delivered it to John R. Vogdes, who was employed as their scrivener, and with authority to him to deliver it to Catharine Yohe, upon her complying with the terms of the agreement on her part; and that Vogdes made repeated efforts to deliver the deed to her, but that, owing to her sudden illness and death, he did not succeed in delivering it, and that the deed is under the control of Vogdes.

That after the death of Catharine Yohe, to wit, on the 29th November, 1843, and at other times, the said Vogdes made a tender of the said deed to Blackstone, one of the executors and devisees.

The bill proceeded:—"But now, so it is, that although the said Henry M. Watts has offered as aforesaid to comply with the agreement and understanding with him as before set forth, and is still ready and willing to do in the premises whatsoever the court may order and direct to be done by him, yet so it is, that the said Henry Roland and Thomas Blackstone, executors and devisees as aforesaid of the said Catharine Yohe, conferring and confederating with divers persons at present unknown to your orators, and contriving to wrong and injure them in the premises, sometimes do pretend that your 'orators cannot make a good title to the lot of ground above described; and at other times that the said lot is encumbered with a mortgage, and at other times they pretend that, by reason of the death of the said Catharine Yohe, the agreement so as aforesaid made with her was ended, and that the said executors and devisees in trust are not bound by it; whereas your orators charge the contrary of all such pretensions to be true; but, nevertheless, under such pretensions, the said executors and devisees in trust have refused to accept the deed so as aforesaid tendered to them, and to perform the said article of agreement which the said Catharine Yohe, in her lifetime, bound herself, her heirs, executors, administrators, and assigns, to fulfil and perform."

Interrogatories were specified to be propounded, and averment made that the complainants were ready and willing to perform, &c.

Joint and several answers by Roland and Blackstone were filed. The agreement of Mrs. Yohe was admitted, but it was denied that the complainants were at that time seized and entitled in fee to the premises, and alleged that they were not conveyed to them till long after that date; but that the only pretence of title which they had was under certain articles of agreement for the purchase of the premises, dated the 18th of September, 1839. The will of Mrs. Yohe was referred to, in which, after directing that all her just debts be paid, she made devises in trust for her daughters, and directed a sale of her real estate and of certain personal estate.

It was alleged that complainants were unable to convey in fee according to the terms of the agreement. The conveyance to Mr. Watts was referred to; also, the deed of Tiernan and others, dated

on the 6th February, 1840; that Mr. Vogdes was *not* employed by Mrs. Yohe; that the deed was to be delivered on condition that bonds and mortgage were executed; that instead of there being but one bond, payable on 9th December, 1846, there were three bonds, one to Tiernan for $3350 with interest, and payable on the 9th day of December, 1840; one to Shoenberger for $1675 with interest, payable on the 9th day of December, 1840; and one to Henry M. Watts for the payment of $1675 with interest, on 9th day of December, 1840: thus varying from the agreement.

It was alleged that the deed was not acknowledged so as to bar the right of dower of the wives of the grantors, inasmuch as the certificate of acknowledgment states the presence of the wives of the grantors; yet in stating the separate examination, the singular pronoun is used, thus confining the statement of the separate examination to one of them, and not designating which.

That they did not know of repeated efforts made by Vogdes to deliver the deed to Mrs. Yohe. It was alleged that the said complainants were so far from being ready to perform their part of said contract within a reasonable time, that they were wholly unable even to set up the pretence of ability so to do, which they now set up, until the 6th day of March, 1843, they having no title to said premises until the 4th day of February, 1840, on which day the deed from James S. Smith and Henry Hollingsworth, executors and devisees of Blackwell, is dated, by which they, the said complainants, acquired title to said premises; nor even then were they able to comply with their said undertaking; for, simultaneously with their obtaining said deed for the premises, they re-granted them, by way of mortgage, unto the said James S. Smith and Henry Hollingsworth, executors, &c., in fee, to secure the payment of thirty thousand dollars, part of the purchase-money of said premises, and other property included in said deed, which was payable on the 1st day of October, 1847. That they made no attempt, as far as these defendants have ever learned, to free the said premises from the said encumbrance until the 6th day of March, 1843, upwards of three years after the entering into said contract, or to put themselves in a condition to make a conveyance in pursuance of said contract, by obtaining the release of said premises from said mortgage—a time, as these defendants are advised, wholly unreasonable for that purpose. Nor did they, when they had obtained said release, give these defendants any notice thereof until long after, to wit, on the 29th of November, 1843; that in the mean time real estate, of the description of that to which said contract pertained, had greatly diminished in value, and had become much less marketable; that had the said Catharine Yohe, or her heirs, taken a conveyance of said property during said interval, they would have found it wholly unavailing to them by reason of the said encumbrance; that she, the said Catharine Yohe, purchased

[Tiernan et al. *v.* Roland and Blackstone.]

the same, as these defendants are advised, upon the construction of the said contract, entirely free from encumbrances.

And these defendants further say, that on the said 6th day of March, 1843, the said complainants obtained a release from the said Smith and Hollingsworth, the said mortgagees, which, these defendants are advised, is inadequate to the discharge of said mortgage in that full and satisfactory manner which a purchaser is entitled to require, and which courts of chancery make a necessary preliminary to enforcing specific performance; said release containing a clause in the words following:—"Provided, however, that nothing herein contained shall be construed to prevent the said James S. Smith and Henry Hollingsworth, executors and trustees as aforesaid, their heirs, executors, administrators, or assigns, from proceeding at law against the whole of the said mortgaged premises, so far as to recover judgment, and issue necessary process of sale, of the whole thereof, but not to sell or otherwise disturb that portion thereof last herein described, (meaning the premises included in the contract of the 9th of December, 1839,) or any part thereof, or to be considered in any other way affecting any proceedings that may be instituted, than preventing any sale of all or any part of that portion of the mortgaged premises last herein described."

And these defendants further say, that said complainants have never, since the death of the said Catharine Yohe, made any competent tender of a deed of said premises, with or without title; that the said pretended tender made to these defendants, as set up in the said bill of complaint, was made during the trial of the said suit on the said five hundred dollar note, so instituted as aforesaid; that the said tender was made upon condition that they, the defendants, would execute the bonds and mortgage prepared as aforesaid and as above stated, wholly varying the conditions of said contract; that the said tender was wholly nugatory, being of a deed conveying the property to Catharine Yohe, who was then deceased, and which, although prepared during her lifetime, had not been delivered during her lifetime, and was therefore inoperative; that the said defendants were wholly unable to execute the said bonds and mortgage so prepared as aforesaid, and the whole tender originated in error and confusion of ideas.

And these defendants further say, that the said complainants had not and have not, from the date of the said contract down to the present time, any such title to the premises, as by the laws of this commonwealth a purchaser may be compelled to take; because they say that said lot or piece of ground was part of the residuary estate of Robert Blackwell, deceased, who devised the same, with life estates, to his daughters and his grand-daughters for life, and to the children, born and unborn, of his grand-daughters in fee. And that the only power which the said James S. Smith

and Henry Hollingsworth had to convey said premises to the said complainants, was under and by virtue of a certain act of Assembly of the commonwealth of Pennsylvania, passed the 28th day of March, 1836, entitled, "An act for the conveyance of certain real estate, and for other purposes," which act was obtained without the consent of all the persons interested or to be interested in such residuary estate; which act of Assembly, and others of a like character, are believed by many persons conversant with the laws, as these defendants are informed, to be wholly unconstitutional and void; but at all events sufficient doubts rest upon titles made under such acts of Assembly to entitle purchasers to refuse to take the same; and they are informed that the validity of such titles has recently been brought into question before this court, and that it has been decided that such title is a questionable title, which this court will not enforce against a purchaser.

That Shoenberger has put it out of his power to comply with his contract by his conveyance, on 5th February, 1840, of a moiety of his interest to Henry M. Watts.

It alleged that an action of covenant was brought by Tiernan and Shoenberger to December term 1843, against the defendants as executors, and alleged the breach of said agreement to be the nonpayment of four years' arrears of interest on the purchase-money, in which case a judgment of nonsuit was entered on the 28th March, 1845.

They asked that they be dismissed with costs.

An affidavit, by T. Blackstone, in the suit on the note, was made on the 29th day of May, 1841. In it he deposed that Catharine Yohe, in her lifetime, or defendants since, have never received a deed for the property for which the note was given, or possession of said property, or did any other, act since the encumbrance on the property was known, to affirm said agreement of the 9th December, 1839; but on the contrary, defendants altogether repudiate the same.

Copy of the opinion of BELL, Justice, sitting in equity :—

So far as is necessary, in this stage of the proceeding, I will proceed to consider, briefly, the several objections interposed by the defendants, to the plaintiff's prayer for a specific performance of the agreement of the 9th December, 1839.

The first of them, as presented by the answer, is, that the plaintiffs were not, at the time they agreed to sell and convey the premises in controversy, seized or well entitled thereto in fee : that the very pretence of title which they had was under certain articles of agreement for the purchase of the premises, dated 18th September, 1839, between them and the executors and devisees in trust of Robert Blackwell, deceased. This is true, but it presents no obstacle against the equitable interposition of the court, as here invoked. A general agreement to sell a property means a sale in

[Tiernan et al. *v.* Roland and Blackstone.]

fee simple, and chancery will not compel a purchaser to take a life estate; nor will he be obliged to take an estate in which the vendor had no interest as owner at the time of the pretended sale, because one who speculates on that which is not within his control, is not a *bona fide* contractor, and because, also, there is no mutuality between the parties. But the seller, though not the legal owner, has an equitable means to make himself so, and if he employs that means successfully, though subsequently to his contract of sale, he may compel a specific performance; for in this there is nothing inequitable : Leigh *v.* Huber, 3 *Watts* 367. Such was the position of the plaintiff, in December 1839. Setting aside for the present the question raised as to the effect of the act of Assembly of the 28th of March, 1836, to enlarge the powers of the trustees under the will of Mr. Blackwell, the plaintiffs, by virtue of the agreement with them, were vested with an equitable estate in the premises, which they converted into a legal estate in fee simple, on the 4th February, 1840, long before any supposed *laches* on their part had occurred. They were, therefore, in a condition to convey to Mrs. Yohe, in her lifetime, the estate they had covenanted to grant, and, in fact, made an effort to perfect its conveyance by deed, on the 6th February, 1840, which appears to have been defeated by the illness and subsequent death of Mrs. Yohe, on the 16th of the same month. In reality, there is nothing in this objection, which, indeed, in this aspect of it, was but little pressed on the argument. But it is, secondly, objected, that one of the parties to the last-mentioned deed was Henry M. Watts, to whom Peter Shoenberger had, on the preceding day, conveyed one moiety of his interest in the premises, with, as it is averred and proved, notice of the sale by Shoenberger and Tiernan to Yohe, and looked with a full understanding that he was to join in any necessary conveyance to her. Notwithstanding this understanding and agreement, the defendants urge that Mrs. Yohe, her heirs or assigns, are not bound to recognise a party in the transaction with whom she never contracted, and that the conveyance to Watts was an election by the plaintiffs to abandon the contract. How an abandonment or relinquishment of the contract can be averred, in the face of the efforts made on the day succeeding the deed to Watts, and, subsequently, up to the present moment, to consummate the agreement, it is difficult to conceive. Such, certainly, was not the intention of the parties, nor did the conveyance to Watts work such an effect apart from intention. It is very true, that one man cannot substitute himself as vendor for another, with whom he has no privity or connection. A purchaser is not bound to accept title from any one but him from whom he bought, or his representatives, as was decided in Taylor *v.* Porter, 1 *Dana* 422, where the pretended vendor had no title whatever, and Taylor, claiming title altogether independent of him, attempted to substitute himself in

[Tiernan et al. *v.* Roland and Blackstone.]

the contract as a party having a right to execute it specifically. But our own case of Le Roy de Chamont *v.* Forsyth, 2 *Pa. Rep.* 507, shows that the mere transmission of the legal title to another, subject to the equity of the purchaser, creates no impediment to a decree for a specific execution, especially when the parties had the sale in view at the time of the transmission. Here but a portion of the land was conveyed to Watts, who, the next day, joined in the deed to Mrs. Yohe, and, as he says, without contradiction, has ever since been willing to perfect her title. There is, then, nothing in this part of the transaction which stands in the way of the plaintiff—for if the purchaser gets the estate he bargained for from the parties with whom he contracted, or their privies, it is all that in equity he can ask.

But it is said, that the deed of the 6th February, which it was sought to tender to Mrs. Yohe, was insufficiently acknowledged by the grantors' wives, or some of them, and that the mortgage and bonds accompanying it were, in their conditions, a departure from the terms of the contract, by which the time of payment of the balance of the purchase-money was, within certain limits, left at the option of the purchaser. Admitting that these objections would be valid in answer to an actual tender pleaded, it is not perceived that they detract from the value of the effort made to offer the conveyance to Mrs. Yohe, in her lifetime, as evidence of the vendors' willingness and desire to comply with their agreement. Had the tender been actually made, and the purchaser objected to receiving the conveyance and executing the bonds and mortgage, because the former was not well acknowledged, and the latter did not conform to the covenants between the parties, and the vendors had declined to amend the acknowledgment or to accept of other securities, until the filing of their bill in this cause, there would, probably, have been solidity in this part of the defence. But this is far from being the case. Mrs. Yohe died before access could be had to her by the vendors' agent, and those who succeeded her have always refused to perform her contract, but not on the ground that the vendors were not willing to accept bonds and mortgage in compliance with the agreement as to the time of payment, which is the only substantial matter connected with it. The subsequent tender in court, upon the trial of the issues at law between the parties, can also, perhaps may be accepted as a proof of a continued willingness of the vendors to convey, and disinclination on the part of the defendants to receive the title. Admitting this deed was, since the death of Mrs. Yohe, insufficient in law as an assurance, it is enough in equity, if the vendor be in a position to convey the estate sold by him, at any time before decree made, unless there has been such lapse of time, change of circumstances, or the vendor has been guilty of such gross laches, as entitles the purchaser to treat the contract as

[Tiernan et al. *v.* Roland and Blackstone.]

rescinded. If, therefore, in this case, it be found that no such objectionable features exist, it is not yet too late to make a conveyance to the persons who, under the original agreement, may be entitled to it. But the defendants aver that all these elements, destructive of the plaintiffs' rights to have a specific performance, are present in the cause. The rules that are applicable to this part of the case, as extracted from the numerous authorities, with which I do not mean to swell this opinion, are thus lucidly stated by Mr. Justice STORY, in Taylor *v.* Longstreth, 14 *Peters' Rep.* 174:—Time may be held of the essence of the contract, either by the express stipulation of the parties, or, it may be, arise by implication, from the very nature of the property or the avowed objects of the purchaser or seller; and even where time is not thus, either expressly or impliedly, of the essence of the contract, if a party, seeking a specific execution has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part, or if, in the intermediate period, there has been a material change of circumstances, affecting the rights, interests, and obligations of the parties, equity will refuse to decree a specific performance, on the ground that it would be inequitable and unjust. But, except under these or analogous circumstances, time is not treated as of the essence of the contract, and relief will be decreed to the party who seeks it, if he has not been grossly negligent and comes within reasonable time, although he has not complied with the strict terms of the contract. Such are the rules which obtain even where a particular time is fixed by the agreement of sale, for consummating it, and, of course, the application is the more stringent where, as here, no distinct period is pointed to: *Sugden on Vend.* 307, 11 ed. 1846. But even then, I agree that a man cannot call upon a court of equity for a specific performance, unless he has shown himself ready, desirous, prompt, and eager; and, therefore, time alone is, in some instances, a sufficient bar to the aid of the court. As, for instance, where the parties differed as to the construction of an agreement, and, after a delay of seven years, one of them filed a bill for specific performance, it was dismissed merely on account of the staleness of the demand: Milherd *v.* Earl of Thayne, 5 *Ves.* 720. A plaintiff calling for performance, after a great lapse of time, must satisfy the court, that he did not lie by to take advantage of fortuitous circumstances; that during the whole period, he had it in contemplation to perform the contract, and that the other party expected to be called on: Aluy *v.* Deschamps, 12 *Ves.* 225.

It may be perceived, from what has been said, that there is a difference between mere lapse of time, and where it is attended with some gross and injurious negligence of a duty incumbent on the party to perform. Where time is material, its mere flight beyond a precise point may bar the equitable remedy. Where it is not of

[Tiernan et al. *v.* Roland and Blackstone.]

the essence of the contract, expressly or impliedly, some inexcusable laches must attach upon the party to estop him from claiming the execution of the agreement.   Where, says C. J. MARSHALL, in Garrett *v.* Muskon, 6 *Call* 336, time is really material to the parties, the right to a specific performance may depend on it.   But if the principle of discharge by delay applies to the case of a willing purchaser, it is open on the other side to rebut that, by showing the purchaser was not a willing purchaser, and that he ought not to be discharged on the ground of hardship or delay :  Sir ANTHONY HART, in McGinnis *v.* Follen, 2 *Moll.* 561.

In the present instance, there is no express stipulation by the parties that time should be material; nor do I derive any such implication of it from the nature of the property sold, or the object of the purchaser, as would justify in itself a refusal of the prayer of this bill.   It has, indeed, been suggested that Mrs. Yohe's object in making the purchase was speculation upon the state of the market, which was defeated by the rapid decline in the price of real estate at about that period ; but this suggestion is unsupported by proof, and were it otherwise, perhaps it would be found to be the duty of the purchaser to tender her securities, and demand a conveyance before she was at liberty to declare the contract at an end. Nor do I see any such material change of circumstances, affecting the interests of the parties, as ought to induce the court to refuse its aid.   As will presently be shown, the death of Mrs. Yohe, not long after the agreement of sale, cannot be allowed to work this effect, and there is surely nothing in the circumstances urged upon us by the defendant's counsel, that her will disposes of all her estate, leaving no room, as it is said, for the operation of the agreement.   Had this will been executed after the purchase, it would have presented no obstacle, being simply the work of the purchaser ; and it is much less so, since it was actually made before the contract of sale.   Time in itself being immaterial here, has there been such supine negligence on the part of the vendors as shall deprive them of this equitable remedy ?   It seems impossible to affirm this with truth, in the face of the earnest endeavours which the bill, answers, and proofs show have, almost from the inception of the sale, been made by the vendors to carry it into effect against the struggles of the defendants in resistance of it.   Upon this head, without descending into minutiæ, it is sufficient to observe that, commencing before the death of Mrs. Yohe, they have pursued this object with almost unabated effort through successive litigations, with more or less success, down to the present time.   Whether, therefore, they have urged the proper course or not, it cannot, at least, be said they have been inactive, or by any supineness led their antagonist into the belief they did not intend insisting upon the fulfilment of the contract.   But it is contended it was their duty, within a reasonable time, to tender to the acceptance of the

defendants a deed for the premises clear of all encumbrances, and that having failed to do so, they cannot now claim a compliance with the agreement of sale. I do not think so. By the custom of the State, it was incumbent on the vendees to propose and tender for execution the necessary instruments to perfect the transaction: this seems to me to be especially so where the time of payment of the purchase-money was, by the terms of the sale, left optional with the vendee. Until this election was made, nothing more, it appears to me, was incumbent on the vendors, than to manifest their continued disposition to fulfil their contract when called on to do so, by the declaration of an election made and a proffer of the necessary papers for ,execution. For this position, Lowry *v.* Mehaffy, 10 *Watts* 387, would seem to be in point. At all events, they cannot be said to be guilty of gross laches, when the other parties not only omitted to call for conveyance, but from the beginning manifested an utter unwillingness to take the estate: Campbell *v.* Shrum, 3 *Watts* 60; and see Hampton *v.* Speckenagle, 9 *Ser. & R.* 212. In excuse of this unwillingness, several reasons are offered by the answer to the original bill. Some of these have already been shown to be insufficient. The two principal ones remain to be noticed. The first of these is, that the death of Mrs. Yohe rendered a specific execution of the contract impossible, as that would require the execution of a bond and mortgage to secure the payment of the deferred instalments to fall due on the 9th of December, 1846, which no one was competent to execute but Mrs. Yohe herself. This objection is more specious than solid. Though the defendants, trustees under the will of Mrs. Yohe, could not be called on to execute these securities, what was there to prevent her heirs at law, or the residuary devisees of her estate, who were made parties by the supplemental bill, from performing the stipulations of the contract in this particular? But apart from this, I think it clear, where such a difficulty arises from the death or bankruptcy of the purchaser, it is in the option of the seller to rescind the contract, or to demand specific performance ; and if the defendants are unable or unwilling to perform the contract, that the estates may be sold, and the defendants ordered to pay any difference in the amount of the purchase-money: Bolles *v.* Rogers, 6 *Ves. Jr.* 95 n., and see Wright *v.* Wellesley, cited in 1 *Sugden on Vend.* 302, 11th ed. It is to be observed, however, that though the inconvenience suggested might have been felt in carrying the contract into execution prior to December 1846, they do not now stand in the way of the action of the court, inasmuch as the whole purchase-money is now due, and payment of it may be promptly decreed.

The next ground taken by the answer is, that simultaneously with the conveyance of the legal estate by the trustees, under the will of Mr. Blackwell, to plaintiffs, the latter put it out of their power to perform their contract, by encumbering the premises by

[Tiernan et al. *v.* Roland and Blackstone.]

mortgage. But this will not afford a ground on which the purchaser may avoid the contract. If the seller remove such encumbrances before he is called on to make title, it is sufficient: *Sugden on Vend.* 679, ed. of 1846. The distinction is between a defective title, and a good title encumbered with a pecuniary charge. Equity will not compel the vendee to take the former, but the latter presents no objection, provided the purchaser can be protected from it: Fourcan *v.* Campanion, 1 *Yer.*; 2 *Moll.* 583; Thompson *v.* Carpenter, 4 *Barr* 132. In our case, the plaintiffs aver that the charge of the mortgage upon the land was sufficiently. removed before their bill was filed; and if so, (and this may be the subject of future inquiry,) I am of the opinion, under the circumstances of this case, its continued existence down to that time raises no obstacle in the plaintiff's path.

It is objected, and this for the first time, by the answer of Tams and wife to the supplemental bill, that on the 29th of May, 1846, the defendants, Roland and Blackstone, by their affidavits filed on record in the suit brought upon the promissory note, entirely repudiated the contract, on account of the encumbrance of the mortgage, and refused to consider the same as binding. But if this was intended as a notice of the rescission of the contract, the defendants did not go far enough; something more is required at the hands of a purchaser than simple notice of his intent to repudiate the agreement. Where a day is fixed for the completion of the contract, he must, in England, demand an abstract of the title, and, in this country, the execution of the conveyance on the day, with notice that if not completed he will not be bound by his bargain. Where no day is fixed, this may be within a reasonable time. But no such demand was made here. Without any previous offer to accept a deed, the plaintiffs, in a suit at law, are informed, as a matter of defence, the bargain is repudiated because of the encumbrance of the mortgage. Now, when it is recollected that this encumbrance, if removed at any time before the purchaser pays the money, offered no impediment, and that at least a demand by the defendant was necessary in a case situated as this is, showing a willingness to accept the title, before the plaintiffs were bound to rid the land of the lien of the mortgage, it is obvious the affidavit of defence is inoperative, as notice of an intent to rescind.

I have thus hastily reviewed all the grounds of defence necessary now to be noticed, and the result is, the plaintiffs have shown an equity which entitles them to have the decree prayed for, provided they can now make a good title for the premises clear of encumbrances. To ascertain this, a reference will be made to a master, and, in the mean time, the cause will stand open for further directions. This course puts out of question at present the objections which have been raised against the goodness of the title, and whether it be such as chancery would compel a purchaser to accept.

[Tiernan et al. *v.* Roland and Blackstone.]

This, with the question of encumbrance, may be considered when the report of the master is made.

The following is an abstract of the title of Tiernan and Shoenberger, the complainants :

Patent by commissioners of proprietors to Edward Shippen in fee, dated 28th January, 1690, for a tract of land of 200 acres. *Patent Book A*, vol. i. 305.

Edward Shippen, by his will dated 10th 7th mo., 1712, devised said tract to his wife in fee, to secure £800 to his son William, if he should attain the age of 21 years, and of his will appointed his sons Edward (2d) and Joseph executors. He further devised that if his executors should pay the £800, the devise should be void, and the land should form part of the residuum of his estate, one moiety of which he devised to his son Edward (2d) in fee, and the other moiety to his son Joseph in fee.

William Shippen attained the age of 21 years, and received the £800, whereby the tract became vested in Edward Shippen (2d) and Joseph Shippen in fee, in equal moieties as tenants in common.

Edward Shippen died seized of his moiety, leaving issue, a daughter, Margaret, wife of John Jekyl. He first made a will, dated December 8th, 1714, of which he named Clement Plumstead and Charles Read, executors. *Will Book D.*

Deed of partition, 2d August, 1736, between John Jekyl and Margaret his wife, sole heiress as above, Edward Shippen (2d) and Charles Read and Clement Plumstead, executors of Edward Shippen (2d), of the one part, and Joseph Shippen, of the other part, whereby 65¼ acres of the larger tract were allotted to Joseph Shippen in fee simple, in severalty. *Book G*, vol. iii.

Will of Joseph Shippen, 30th December, 1740, whereby he devised said tract of 65½ acres in the residue of his estate, to his three sons, Edward (3d), Joseph (2d), and William (2d), in fee. *Will Book*, 219.

Deed of partition, 10th March, 1741, between the above named three sons and devisees of Joseph Shippen, whereby the two southernmost parts or allotments, next to Thomas Lawrence's plantation, (one containing 11 acres 93 perches, the other reputed to contain 1 acre 12 perches, with right of a two-perch lane between them, and thence extending all along northward into Cedar street,) became the several and distinct parts of Joseph Shippen (2d), and the two next adjacent allotments became the several and distinct parts of William Shippen (2d). Plan recorded with deed, and therein referred to. *Book C*, vol. ii. 48, &c.

Deed. Joseph Shippen (2d), et ux., and William Shippen (2d), et ux., convey to John Stamper in fee two tracts of land in Passyunk township, Philadelphia county, one of them beginning at a post in a line with Jacob Duche's land, and particularly described

[Tiernan et al. *v.* Roland and Blackstone.]

by courses and distances, &c., containing 13 acres 108 perches, besides 44 perches allowed for a curve in the first line called north 80° W : the other tract also particularly described, and containing 154 square perches. Within the limits of which two described tracts of land are contained the above-mentioned two allotments of Joseph Shippen, with some of the adjacent allotments of William Shippen, together with the right of the lane.

This deed recites all the previous titles hereinbefore set forth. *Deed Book G. S.*, *No. 9, p.* 410, *&c.*

Will of John Stamper, devising to his daughter Mary Bingham, *inter alia,* the premises by the description : " All that my piece of land situate in Moyamensing township, adjoining lands of Jacob Duche and others, containing about 15 acres with the appurtenances," *habendum* to the said Mary for life, and after her death to her three children, viz. James Bingham, William Bingham, and Hannah Benezet, as follows, viz. one-third to James Bingham for life, remainder to William Bingham and Hannah Benezet in fee, in severalty as tenants in common. One other third to William Bingham in fee, and the other third to Hannah Benezet in fee. He further orders that after Mary Bingham's death, a partition of his estate among the three children shall be made by indifferent men, mutually chosen, who were to set forth the several shares. He appoints his son Joseph a guardian, to receive the rents, issues, and profits of the share devised to James for life, &c. &c. *Will Book S,* 151.

Deed of tripartite, James Bingham of first part, Robert Blackwell and Hannah his wife, (late Benezet,) of second part, and William Bingham, et ux., of third part, recites the above will of John Stamper, the death of Mary Bingham and Joseph Stamper the guardian, and the intermarriage of Hannah Benezet with Robert Blackwell. Also, that since the decease of Mary Bingham and Joseph Stamper, three men, mutually chosen, had made partition as per above will, and at the request of the parties, and had allotted to Robert Blackwell and Hannah his wife, her heirs and assigns, the said piece of land in Moyamensing, *inter alia,* subject to pay James Bingham for life one-third of the net rents, issues, and profits, &c. &c.; and James Bingham and William Bingham, et ux., convey, *inter alia,* to Robert Blackwell and Hannah his wife, her heirs and assigns, the said 15 acre tract in Moyamensing, subject to pay James Bingham one-third of the net rents, issues, and profits. *Deed Book* 45, *p.* 453.

James Bingham afterwards died.

Will and codicil of Hannah Blackwell :—

Will. Reciting her power to make a will by virtue of an antenuptial settlement therein referred to, pursuant to those powers she devises, *inter alia,* all her real estate to Maria Benezet, daughter of her first marriage, and to all the children thereafter to be born

[Tiernan et al. *v.* Roland and Blackstone.]

of testatrix, in equal shares in fee, &c., but if said Maria and all her children should die under age and without leaving lawful issue, then she devises all her real estate to her husband, Robert Blackwell, in fee.

Codicil. Reciting the death of her daughter Maria Willing, late Benezet, on August 10th, 1799, and it being her wish, in consequence of that event, to prevent any misconstruction of the foregoing devises, she makes this codicil, and wills that it was and is her will on the death of said Maria without issue, to give and devise all her real estate to her husband in fee, and she accordingly gives and devises all her real estate (the premises being part thereof) to said Robert Blackwell in fee. *Book of Wills, No. 6, p.* 206, &c.

Articles of marriage referred to in the will and codicil last recited : —

Robert Blackwell of first part, Hannah Benezet of second part, and Joseph Stamper, William Bingham, and Daniel Benezet of third part, (but the deed is not executed by William Bingham,) reciting intended marriage between the parties of the first and second part, Hannah Benezet grants to parties of the third part all her estate in possession, remainder, reversion, or expectancy, in trust for her use, &c. Parties agree that she may grant or sell, or dispose by will in fee, or for a lesser estate; effect to be the same as a conveyance at common law, declaration of uses and trusts, or as a will, &c. Parties of the third part covenant to stand seized to such uses, &c. There is a power of revocation, &c., and a reservation and application of all these powers, rights, &c., to after acquired property. *Mortgage Book, No.* 2, *p.* 398, &c.

Thus Dr. Robert Blackwell became seized of said tract in fee, on the death of his wife, which took place about the year 1816.

Will of Dr. Robert Blackwell :—

After sundry devises and bequests, he devises the premises in the residue of his real estate to James S. Smith and Henry Hollingsworth, their heirs, &c., in trust; as to the real estate, to let and demise the same, receive rents, &c., and to pay over to his daughter, Rebecca Harrison Willing, for life; at her death, the trustees to name seven men, who, with the trustees, are to divide his estate among his seven grandchildren, and the partition to conclude all concerned. Particular dispositions made as to each share, and other legacies not necessary to be here stated, and a provision to fill vacancies in the trustees. He also appoints Messrs. Smith and Hollingsworth executors of his will.

Codicil. Making certain specific bequests, and ratifying and confirming his will.

Will and codicil proven, February 19, 1831, and recorded.

On the 28th of March, 1836, an act was passed by which Smith and Hollingsworth were authorized to sell by public or private

[Tiernan et al. *v.* Roland and Blackstone.]

sale, or to let on ground rent, the lot in question—the whole or any part—" and *to make and execute to the purchaser or purchasers thereof, a good and sufficient deed or deeds of conveyance and assurance in the law for the same; which conveyance and assurance shall vest in such purchaser and purchasers, all the estate, right, title, and interest in law and equity, which the said Robert Blackwell, at and immediately before his death had and held in the same, as fully and completely and with like effect, as if the said conveyance and assurance had been made and executed by said Robert in his lifetime, and that the moneys arising from such sale be appropriated by the said executors and trustees, agreeably to the intention of the said Robert, deceased, as expressed in his last will and testament with respect,"* &c.   The following proviso is then added:—" Before the said executors shall proceed to make such sale, *they shall give security in the Orphans' Court for the City and County of Philadelphia,* in such manner and in such sum as the said court shall order and direct, *for the faithful application of the proceeds of the sale* of the real estate hereby authorized to be sold."

In January, 1840, Smith and Hollingsworth entered into bond under the provision above referred to, and they, Smith and Hollingsworth, as executors and devisees in trust of Dr. Robert Blackwell's estate, executed a deed dated February 4, 1840, to Tiernan and Shoenberger in fee, as tenants in common, for premises which included the ground agreed to be sold to Mrs. Yohe.

As to the title, *J. W. Wallace*, Esq., appointed as master, reported :—

The title is admitted to be satisfactorily deduced from the proprietaries to Joseph and Edward Shippen as tenants in common in fee for a tract of land including the property in question, beginning on the Delaware edge, thence running westward somewhere between Broad street and the Schuylkill, and extending southward from Cedar or South street, in some parts, I should suppose, to the furthest portions of our peopled districts, and containing about 178 acres.

This Edward Shippen, by his will, proved in 1714, devised his moiety to his "daughter Margaret Shippen *and the heirs of her body lawfully begotten,*" and *failing such issue, then unto the children of his brother Joseph,* and *appointed Clement Plumstead and Charles Read his executors.*  This daughter married John Jekyl, and by deed made in 1736, (*Plumstead and Read being parties to it, and acting also as attorneys in fact for Mr. and Mrs. Jekyl,*) Joseph Shippen makes *a partition* with these latter, by which the two parties take an *equal number of acres* nearly, and each grants, releases, enfeoffs, and confirms to the other *in fee simple* the parts respectively allotted to them.  *No interest in the estate, or power over it, is given by the will to Read and Plumstead,* who, as executors, join in the partition.  *The partition has never been*

2 N

*called in question* by any party as unequal; *and the tenants in tail have never been in possession* of any sort, since it was made. *Joseph Shippen,* just named, by his will, proved in 1741, *leaves to his daughter certain pecuniary legacies,* which, he says, " *shall comprehend and be in full of any sum or sums which I may have promised to her.* . . . *or to her husband,* . . . . either before or after their marriage, *or which they, or either of them, claim or reasonably expect on any pretence whatever;* and *I require that they sign a general release and discharge to my executors.* He then devises *all his real estate* to his sons *in fee, who immediately afterwards make partition of it among themselves, each party granting and assuring to the other his respective share in fee.*

The title is thence deduced regularly enough through two of these sons to Mrs. Hannah Benezet, *who, contemplating a marriage with the Reverend Dr. Blackwell,* grants, bargains, sells, and confirms, in 1783, by deed reciting the contemplated marriage, and *intended as a settlement* of her own property, all her real estate to trustees " *in trust,* nevertheless, to and for *the only proper use, behoof and benefit of the said Hannah Benezet,* her heirs and assigns for ever, and *upon the further trust and confidence, that it shall and may be lawful for her, her coverture notwithstanding,* ' *by any deed or instrument to take effect in her lifetime, or by her last will, &c.,—to give and devise,* or to grant, bargain, and sell, and convey *in fee simple,' &c., all the premises as she shall think fit.*" The trustees then covenant to stand seized to such purposes, &c. The deed then recites that *Mrs. Benezet possessed a considerable personal estate, of which the marriage would operate as a gift to the doctor; that he is willing she should dispose of it according to her own inclination. He then covenants that she may make a will disposing of it to the amount of £4000, and to such further amount as any other personal property which she might thereafter receive should come to; and he binds himself and his estate to pay all such legacies out of any of Mrs. Benezet's personal property which may come to her hands.*

By the same deed or articles, Mrs. Benezet acknowledges a debt of £1725 to her trustees, and recites, that to secure another debt of £1700, she had executed a mortgage on her real estate, payable August 24th, 1794, to a daughter of a former marriage: that the doctor was willing to secure the payment out of the personal estate of Mrs. Blackwell, and covenants that HE " *will pay the said sum of £1700 on or before the 2d August, 1794.*" This covenant is absolute.

This daughter died in 1799, having first married Mr. George Willing, who survived her.

*The will of Mrs. Blackwell shows that she did dispose of £4000 in virtue of the power reserved in the deed of settlement,* and there is no evidence that the doctor, during her life, ever claimed it.

[Tiernan et al. *v.* Roland and Blackstone.]

Mrs. Blackwell died in 1815–16; having appointed and devised her real estate to her husband, who took possession of it, and, with those who claim under him, *has held possession of it, without question, from that time to this;—a term of thirty-three or thirty-four years.*

Upon this state of facts, the defendant objects to the title, because,

1. Under the will of Edward Shippen there is a remainder in fee dependent on an estate-tail in his daughter in a moiety of the land allotted to Joseph Shippen by the so-called "partition," the estate-tail never having been barred.

2. There is no evidence of the alleged marriage-settlement of Mrs. Blackwell, the copy produced not showing that "Benjamin Paschall" had any power to take probates, and the paper having, therefore, been improperly admitted to record.

3. The copy of the alleged settlement shows that, under the statute of uses, no trust estate of the real estate ever vested in Mrs. Blackwell, but that the legal estate immediately revested in her. That, accordingly, the power given to her by the settlement to appoint merged, she having acquired both the legal and equitable estate: and, even if the deed were one which equity would reform in favor of a meritorious person, it will not do so in favor of Dr. Blackwell, who is a mere volunteer.

As to the *first* objection, the master observed that there was no decision in Pennsylvania which intimates such a partition as this to be bad: 1 *Yeates* 243, Morris *v.* Smith; but that, looking at the analogies of the law, and at substantial law and equity and convenience, he inferred that such partition was good: *Allnatt* 31. But whether good or not, the partition was made good by the assent to it which was given by the children of Joseph Shippen. He, supposing that the partition had passed a fee to him, devised to his sons in fee the estate of which, it is said, they had a remainder under the uncle's will; and he leaves to his daughter, his remaining child, pecuniary legacies on condition that she discharge his estate from all other claim. The sons, soon after, made partition of this property in fee; and the daughter, it must be presumed from her acquiescence in the act, accepted the money in full of every claim of hers. How then can either the daughter or the sons ever dispute the validity of the partition? They all claim under their father's will—the daughter who accepted her *money*, and the sons who accepted and divided *the land in fee.* They cannot claim under their *father's* will, which gives them one estate, and under their uncle's also, which gives them an estate inconsistent with it.

He added, that no objection is made from the tenants in tail. The lapse of time has, of course, barred the claimants in tail.

As to the *third* objection, he observed: Without going into an inquiry whether, in the face of the words of this settlement, the legal estate reverted to Mrs. Benezet in the same instant that she parted

with it,—or whether, if it did, her power to dispose of it after marriage was gone,—it is enough to say that the very and *precise object* of the settlement was to put the estate into the hands of trustees, and that the intention is unusually manifest.  If, then, through the mistake of the clerk, it is not technically attained, "any person within the influence of the marriage-settlements," (*Atherly* 125,) or a purchaser, or one who, being neither, is yet "a meritorious person," (*id.* 178,) may apply to equity, which—as against *heirs*, the only parties suggested as having an interest here, will force the execution in such a way as to complete the intent. And to do this, equity will treat a deed as mere articles.

Atherby, (125,) quoting Lord MACCLESFIELD, says that *the husband* is within this influence, and if the statement in this general form is true, then Dr. Blackwell, and those who claim under him, of course, would be entitled, under any circumstances, to equitable relief, if they want it.

But their case does not need to stand upon that ground.   The doctor, by his settlement, not only binds himself to let Mrs. Blackwell enjoy her own personal property, which her testamentary dispositions of it show that she did do, and binds himself and his estate, personally, to pay all her legacies to the amount of it, *but also binds himself and his estate personally to pay, and in point of fact no doubt did pay, during his wife's lifetime a mortgage debt of hers on her real estate of £1700, to her child by a former marriage.*   This puts him, I think, in a meritorious position, if it does not make him a purchaser.   Certainly he is not a pure volunteer.

I say nothing of the fact, that the heirs of Mrs. Blackwell— who would be the only persons interested to dispute the doctor's title—have never questioned it at all, but have acquiesced in it for between thirty and forty years.   Supposing the property to be clear of encumbrances—a matter which has not been touched before me, and which I suppose to be granted—I am of opinion that the complainant can make and exhibit a good title to the estate mentioned in the bill; and so I report.

As to the mortgage of $30,000, dated February 4th, 1840, the master reported that it had been released by Smith and Hollingsworth to Tiernan and Shoenberger, and their heirs and assigns, by release, dated 6th March, 1843.  He reported that the parties were in a condition to make a conveyance clear of encumbrances immediately after the execution of the release.

To the report of the master, exceptions were filed.

The said defendants except to the said report;  For that the said master has, by his said report, certified that he was of opinion, and reported that the complainants can make a good title to the premises in question, whereas he should have reported that the complainants could not make a good title.   Because,

1. Under the will of Edward Shippen, 2d, (dated in 1714,) there

appears to be a remainder in fee, dependent on an estate-tail in his daughter in a moiety of the land; which remainder is outstanding, the estate-tail not having been barred.

2. There is no evidence of the marriage-settlement of the estate of Mrs. Blackwell. The copy produced showing it has never been properly proven to admit it to record, and there being no evidence that the person taking the probate was authorized so to do.

3. The copy of the alleged marriage-settlement shows, that under the statute of uses no trust vested in the trustees, but that a legal estate immediately revested in Mrs. Blackwell; wherefore the power given to her merged, and her will passed nothing to her husband.

4. The will of Dr. Blackwell makes a disposition of the estate, which is inconsistent with the power to sell by his executors and trustees, and with the title attempted to be conveyed by them to the complainants.

5. That the estate thus transferred, was conveyed under a power given by an act of Assembly, which was void—or at least created no such title as a purchaser will be compelled by a court of equity specifically to accept.

6. That the estate is encumbered by a mortgage for $30,000, dated February 4th, 1840.

7. That the master has not reported at what time the complainants were first in a condition to make a conveyance clear of encumbrances.

Wherefore the said defendants do except to the said master's report, and do appeal therefrom to this court.

On 4th April, 1849, a decree was made as follows :—And now, to wit, this 4th day of April, A. D. 1849, this cause again coming in for further hearing, before the said justice sitting in equity, upon the said master's report and the exceptions thereto, and the same being argued by counsel for the plaintiffs and defendants respectively, his honor, on consideration thereof, did order and decree that the said exceptions be overruled as insufficient, and that the report of the said master be confirmed; but inasmuch as questions have been raised and doubts suggested as to who should be ordered to pay the said purchase-money, and out of what fund and to whom and for whose use the title of and in the said premises should be executed and delivered, it is further ordered, that it be referred back to the said master to inquire and state to the court to whom and for whose use, benefit, and behoof, and in what manner a conveyance of the said title to the said estate and premises in question in this cause, should be made according to the said agreement and the report of the said master; and when and by whom the said purchase-money of the said estate should be paid, and to whom, and the amount thereof, with interest, &c.

The master reported as to the will of Mrs. Yohe, that the balance

[Tiernan et al. *v.* Roland and Blackstone.]

due on the agreement on 4th April, 1849, was $10,446.41, and that he supposed, as matters of law—

1. That the item of property which is the subject of this bill passed under the residuary clause already mentioned; and that under our act of Assembly, of 24th February, 1834, Captain Blackstone has an estate in the property in trust to sell it according to the directions of the will.

2. That the debt due by Mrs. Yohe for the purchase-money of the estate is on the same foot with her other debts, and is to be paid just like them, that is to say, out of her estate. It is the duty of the executor, and not, I presume, of the complainants, to see that the assets of the estate are applied in an orderly way to the payment.

He reported that the deed be made by Tiernan, Shoenberger, and Watts, and their wives, to Blackstone, surviving executor, and his heirs and assigns, &c., upon and in trust for the uses mentioned in the will of Mrs. Yohe, and the codicil; and that before its delivery, Blackstone pay to Tiernan and Shoenberger, $10,446.41, out of the assets of the estate.

BELL, J., delivered the following opinion:—

No doubt the parties to the deed of partition, of 1736, intended to bar the estate-tail, and respectively to convey estates in fee, in the lands which were the subject of it. The ingenious reasoning of the master's report goes far to show that as the law then stood in Pennsylvania, the conveyance was efficacious for that purpose, at least in respect of the purpart released to Joseph Shippen. But it is not necessary to decide this point. Admitting the conclusion favoured by the master to be incorrect, it is very certain the statute of limitation has, long since, closed upon the rights of Mrs. Jekyl's issue, as tenants in tail, if, indeed, she left any. The lapse of one hundred and twenty-two years affords much more than sufficient scope for the presumption that the first tenant in tail is dead, and that her issue have long ago attained full age. Indeed, this is conceded by the defendants, who make no attempt to set up an outstanding title in Mrs. Jekyl's issue, upon which any impeachment of the plaintiff's title can be based. But though the estate-tail be thus barred in favour of those who claim under the deed of 1736, it is contended it still exists, in law, for the protection of the remainders dependent upon it, and that the presumption, in the absence of express proof is in favor of its continuance as against the remaindermen's right of entry, to a period within the time limited by the statute. This being admitted, it is, on the other hand, conceded that Joseph Shippen's sons, who are two of the three that are entitled to the estate in remainder, and those claiming under them, as heirs, are estopped from setting up the estate in remainder as against their alienees. Their father, asserting a several estate in himself, by virtue of the deed of partition, devised,

[Tiernan et al. *v.* Roland and Blackstone.]

*inter alia*, the land in question to these sons in fee.    Having entered as devisees, they made partition of the land between themselves.    Having thus elected, they were brought within the rule, which obtains, both at law and in equity, that the person claiming a benefit under a will must acquiesce in the whole of it, though the effect be to deprive him of an estate he would otherwise be entitled to.    This rule embraces not only present but future remote interests, and has been expressly applied to a remainder expectant upon an estate-tail: Groves *v.* Forman, 3 *Ves.* 67.    Recognising this, the defendants do not attempt to take advantage of an outstanding estate in these sons.    But they assert such to exist in the heirs of Joseph Shippen's daughter, the only remaining party having an interest in the remainder.    By his will, her father bequeathed to her certain pecuniary legacies, and devised all his real estate to his sons in fee.    The presumption, at this distance of time, is, that the legacies were paid to her, and that she executed the general release and discharge stipulated by the will.    Now, what is the rule as applicable to this state of facts?    Distinctly, that if a legacy is bequeathed, and an estate or a specific thing, belonging to the legatee, is devised to another, the legatee cannot claim his own and the legacy also, but must elect: 2 *Sugden on Pow.* 159.    Some diversity of opinion, and, perhaps, of decision, has obtained whether acceptance of the legacy operates as a forfeiture of the estate, or whether effect shall be given to it by the sequestration and application of so much of the thing taken under the will as will recompense the disappointed devisee for the estate which the legatee refuses to relinquish to him.    The former position is favored by Mr. *Sugden*, in a strain of very strong reasoning, while the latter was preferred by the late Mr. Justice KENNEDY in his elaborate *dictum* in Philadelphia *v.* Davis, 1 *Whar.* 511.    But there is no room for the consideration of this diversity in a case where, like the present, there was, more than a century ago, an acceptance of the legacy, and during the whole of that long period—long particularly in this country—no claim set up by anybody to the estate, derived under other title than that created by the devise.    There is, therefore, not only election, but relinquishment also—acceptance of the legacy and relinquishment of the contingent estate.    But this is not the objection.    It is, that the daughter, being a *feme covert*, could do nothing to affect her estate in the land.    But it is long settled that the doctrine of election applies to the interest of persons under disabilities, as infants and married women; nor is it material whether these interests are immediate or remote, contingent, of value or not of value: 2 *Ves.* 560, 696, 697; 3 *Ves.* 383; *Ward on Leg.* 187.    The case of McClure *v.* Douthett, 6 *Barr* 416, cited for the defendant, has no application.    The general remark made by the chief justice as to the power of a married woman to affect her estate, in its applica-

[Tiernan et al. *v.* Roland and Blackstone.]

tion there, means nothing more than that one under coverture, without special power, can only convey in the mode prescribed by positive law.

The second objection made against the plaintiff's title before the auditor, is abandoned here, and

The third is sufficiently answered in the report of the master.

I am, therefore, of opinion, that the plaintiffs offered to convey a good, marketable title, which the defendants are bound to accept.

Decree was made accordingly.

The fourth and fifth exceptions to the master's report were abandoned by the counsel for the appellants before the court in banc; the constitutional power of the legislature being conceded since the decision in Norris *v.* Clymer, 2 *Barr* 277.

The case was argued by *McMurtrie* and *Hirst*, for appellants; *Penrose* and *Meredith*, for appellees.

April 7, 1851.

PER CURIAM.—Decree affirmed on the opinion delivered at *Nisi Prius*.

It was decreed as follows:—And now, to wit, 7th April, 1851, this cause came on for hearing on the record and proceedings of our court sitting in equity, at *Nisi Prius*. Upon consideration thereof, and that it appearing that since the decree of said court, made the 29th April, 1849, to wit, on the 7th September, 1849, the said Thomas Blackstone, surviving Henry Roland, executor of the said Catharine Yohe, deceased, was dismissed and discharged, by the Orphans' Court of the county of Philadelphia, as executor of the will of the said Catharine Yohe, deceased; and that afterwards, to wit, on the 11th day of October, 1849, letters of administration *de bonis non cum testamento annexo* of the said Catharine Yohe, deceased, were granted, by the register of wills of the said county, unto William L. Hirst, Esq., and Abraham Rex; it is in pursuance thereof ordered, adjudged, and decreed by this court that the said William L. Hirst and Abraham Rex, administrators as aforesaid, be substituted instead of the said Thomas Blackstone, surviving executor as aforesaid; and that the said Francis Tiernan and wife, Peter Shoenberger and wife, and Henry M. Watts and wife, do execute and deliver a good and sufficient deed, conveying the premises and estate described in the said agreement of the 9th December, 1839, to the said William L. Hirst and Abraham Rex, administrators as aforesaid, their heirs and assigns, upon and in trust nevertheless for the uses, purposes, and interests particularly mentioned and directed by the said Catharine Yohe, deceased, in the items IX. X. and XI. of her said last will and testament, dated the 22d March, 1839, and a codicil thereto, dated 2d April of the same year; and that at and upon the delivery of the said deed, and in case of the refusal of the said William L. Hirst and

[Tiernan et al. *v.* Roland & Blackstone.]

Abraham Rex, administrators as aforesaid, to accept the same, then, upon the filing of the said deed among the papers of this suit, the said William L. Hirst and Abraham Rex, administrators as aforesaid, shall well and truly pay to the said Francis Tiernan and Peter Shoenberger the just and full sum of $10,446.41, with interest from the 28th April, 1849, the date of said decree, up to the time of affirming the same in this court, and interest on the same until paid, together with the costs of the process and proceedings of this cause, out of the assets of the estate of the said Catharine Yohe, deceased; and in all other respects it is ordered, adjudged, and decreed that the aforesaid decree of said court be and the same is hereby affirmed with costs.

COULTER, J., dissented.